## HARRY HURWITZ'S CASE.

Worcester.    September 26, 1932. — October 26, 1932.

Present: RUGG, C.J., CROSBY, PIERCE, WAIT, & DONAHUE, JJ.

*Workmen's Compensation Act,* Amount of incapacity, Amount of compensation, Findings by Industrial Accident Board, Impartial physician.  *Evidence,* Presumptions and burden of proof.

On evidence, in proceedings under the workmen's compensation act, that the claimant, who worked on a knitting machine seventy-six inches wide and had to use his eyes as well as his hands while at work, lost the vision of one eye when a needle flew from the machine into it in 1924; that shortly thereafter the claimant returned to work and continued at the same job until August, 1930, although the quality and quantity of his work were not so good as they had been before his injury and his work put considerable strain on his other eye; that his employer gave him the same wages during such period because he felt morally obligated to him; that at the end of such period· the employer's plant was closed for several months; that when it was reopened about two thirds of the employees, not including the claimant, were reëmployed; and that the claimant applied for work at various places but was unable to obtain work of any kind, there being no evidence of general business conditions at the times when he so applied or that he was unable to secure work because of business conditions then, a finding by the Industrial Accident Board, that the claimant's inability to secure work after August, 1930, was due to the injury in 1924 and that he was partially incapacitated after August, 1930, was warranted, although there also was testimony by a physician called by the insurer and a report by the impartial physician in substance that the claimant could do his work on the knitting machine practically as well with one eye as with two.
The Industrial Accident Board, hearing a claim for compensation under the workmen's compensation act, is not bound by statements contained in the report of an impartial physician.

CERTIFICATION to the Superior Court under the provisions of the workmen's compensation act of a decision by the Industrial Accident Board awarding compensation for partial incapacity.

Material evidence and findings by the board are stated in the opinion.  In the Superior Court, a decree was entered

by order of *Lummus*, J., in accordance with the board's decision. The insurer appealed.

The case was submitted on briefs.

*S. S. Bean & E. W. Sawyer*, for the insurer.

*D. Goldstein, J. Asher, & C. Grace*, for the claimant.

CROSBY, J. This is a claim under the workmen's compensation act for partial incapacity for work. G. L. (Ter. Ed.) c. 152, § 35. The employee on January 25, 1924, while employed by Brown's Beach Jacket Co. received an injury arising out of and in the course of his employment. The report described the injury as follows: "a broken needle flew out of the machine and struck him in the eye." The nature of the injury was stated to be "possible loss of sight — left eye." The average weekly wage was stated to be $30. Agreements for compensation were entered into, under which the employee was paid weekly compensation of $16 to March 23, 1924, on which date he signed an agreement for discontinuance of compensation and returned to work. He continued to work until August 12, 1930. In addition to the weekly payments the employee was paid specific compensation at the rate of $10 a week for a period of fifty weeks for the permanent loss of vision of the left eye. The employee's present claim is for partial incapacity subsequent to August 12, 1930. The single member states that upon the evidence he found "that the employee's inability to secure employment since August 12, 1930, was due to the effects of his injury of January 25, 1924, . . . that, because of said injury, his ability to earn wages equivalent to those earned by him prior to the injury, has been reduced in the general labor market. I find, however, that there are many forms of light work which he can do. I find that, since August 12, 1930, the employee has been able to perform light work at which he can earn an average weekly wage of $15; that he is, therefore, entitled to the payment of a weekly partial compensation of $10 dated from August 12, 1930, and continuing subject to the provisions of the statute. . . ." The reviewing board affirmed and adopted the findings and decision of the single member. Thereafter a final

decree was entered in the Superior Court in accordance with the decision of the Industrial Accident Board. The insurer appealed from this decree.

The finding that the employee was partially incapacitated as a result of his injury and his ability to earn wages was lessened must stand if supported by the evidence. *Di Giovanni's Case*, 255 Mass. 241. *Johnson's Case*, 258 Mass. 489. The employee testified that he was employed by the insured as a loom operator. His work consisted of knitting some kind of cloth and required keeping the needles straight and the machine so that it would run all right. He had to use his eyes and hands at his work. On January 25, 1924, a needle flew out of the machine and "bounced right in my eye and bounced out again." The machine he operated was seventy-six inches wide and he had to watch the cloth and the needles and see if there were any holes in the cloth and if anything went wrong he had to stop the machine. After he went back to work he could not see the whole of the machine without turning his head from right to left. He could do the work after he returned but not so fast as before the injury. His employer told him he was not putting out as much work after the injury as he did before. Watching the loom puts too much strain on his right eye; after he has been working "quite a few hours" the strain on his right eye will cause him to be blind for a few seconds; that would occur several times during the day. The factory was closed down from August, 1930, to January, 1931. About the middle of January some of the men were recalled to work, but he was not. He has not done any work since August 12, 1930. He applied to five different companies but was unable to get work at any of these places, he does not know why. He has not done any work since January, 1931. When he was laid off his wages were $30 a week, the same as before he was injured. On cross-examination he testified that at the various places where he applied for employment he was looking for any kind of work he could get.

Samuel W. Brown, called by the claimant, testified that he was president and treasurer of the insured company; the

claimant had worked for him since 1919. After the claimant was injured he took him back and put him to work. In his opinion after the employee came back after his injury his work was not so good as it was before the injury — there were imperfections in the cloth and there was a loss of production. In his work the claimant would have to be alert at all times. A man with one eye would be less valuable than one with two eyes. He gave the employee the same wages after he came back to work as he did before he was injured. He stated that as the claimant was injured in his plant he felt morally obligated to do what he could for him. At times he told the claimant that his work was not so good as it had been. His plant was closed in September, 1930, and was reopened January 13 following and he recalled for work about two thirds of the men. His factory was not running at the time of the hearing before the single member. He stated that he hoped to start again soon. On cross-examination he testified that the employee did not earn $30 a week for six and a half years "in the same proportion as the others but under the conditions he was satisfied."

The testimony of a physician called by the insurer was that he treated the employee after his injury, and examined him August 26, 1931. The vision of his right eye was normal. He did not see why a man with one good eye would not see the work perfectly well. Any ordinary work the employee had been doing before he was injured he would be able to do just as well except work requiring vision from the left side. Assuming that the knitting machine was about seventy-six inches long he should not think that the employee would have any difficulty in doing the work which was directly in his vision. He would have to turn his head a little more to the left than a man with two good eyes, in order to do the work. He further testified that the employee had a small optical defect in the good eye; that temporary blindness might occur after working some time; that the condition of that eye was not uncommon and that temporary blindness might happen to anybody. On cross-examination this witness testified that the fact that the employee had lost the sight of one eye might interfere a little with him in the

performance of his work, if he were having constant breaks in his thread, otherwise he did not think it would interfere very much with his work; that with such a loom as described, with fine woolen goods one can see perfectly with one eye. "About one quarter of employee's field of vision is gone due to the loss of vision in his left eye." On redirect examination the witness stated that "He does not think that the turning of the head a little more on account of the loss of vision in the left eye, would have any effect on the remaining good eye. The employee would have to turn his head about twenty-five per cent more with his left eye gone than if he had two good eyes."

The impartial physician reported that he examined the employee September 19, 1931; that his right eye was normal, and his left eye was blind except for light. He examined him on May 3, 1924, and the condition was the same as when the last examination was made. He is incapacitated for work "only as any one would be when working with one eye, as his other eye is perfectly normal. Naturally I would state he is not incapacitated unless his work is such an extremely fine nature that binocular vision is requested."

From the testimony of the employee and that of his employer it could have been found that after the injury and because of it the employee in the position in which he was employed was not able to do his work as well, and that there was loss in production which resulted in diminished earning capacity. In view of this evidence the board was justified in finding that the employee was partially incapacitated. The board was not bound by the testimony of the physician who was called by the insurer or by the report of the impartial physician. *Johnson's Case*, 258 Mass. 489, 493. As the evidence warranted the findings of the single member they must stand. *Pigeon's Case*, 216 Mass. 51, 52. *O'Reilly's Case*, 265 Mass. 456. *Percival's Case*, 268 Mass. 50. *Corbett's Case*, 270 Mass. 162, 164. The facts which could be found in the present case distinguish it from *Capone's Case*, 239 Mass. 331, and *Driscoll's Case*, 243 Mass. 236. The circumstance that the employer paid the employee the same wages after he returned to work as he had received before

he was injured because the employee had been injured on the employer's premises and he felt morally obligated to do what he could for him is not necessarily inconsistent with the finding of partial incapacity. *Johnson's Case*, 242 Mass. 489. *Percival's Case*, 268 Mass. 50, 55. There was evidence that when the employee was laid off he tried to obtain work in different places without success. There was no evidence to show that he was unable to secure work because of business conditions, nor that in August, 1930, general business conditions were such that he was unable to obtain work of a kind he was able to perform. The single member expressly finds "that the employee's inability to secure employment since August 12, 1930, was due to the effects of his injury of January 25, 1924." In the absence of testimony as to business conditions at the period of time in question the single member and the board were entitled "to use their own judgment and knowledge in determining that question." *O'Reilly's Case*, 265 Mass. 456, 458.

As no error of law appears, the entry must be

*Decree affirmed.*